Martin R. Barash, United States Bankruptcy Judge *648 I. INTRODUCTION
This adversary proceeding arises out of the prepetition acquisition of a secured loan by defendant Radians Wareham Holding, Inc. ("RWHI") and the prepetition exercise of remedies under that loan agreement against the chapter 11 debtors herein, Ironclad Performance Wear Corporation, a California corporation ("ICPW CA"), and Ironclad Performance Wear Corporation, a Nevada corporation ("ICPW NV") (collectively, the "Debtors").[3] The plaintiff herein, Matthew Pliskin ("Plaintiff"), is trustee under a trust created pursuant to a joint plan of liquidation ("Plan") confirmed in the above-referenced chapter 11 cases. Plaintiff is successor in interest to the official committee of equity holders for ICPW NV ("Equity Committee"), which commenced this adversary proceeding prior to confirmation of the Plan by filing the complaint herein ("Complaint"). Adv. Dkt. 1.[4]
The Complaint alleges that RWHI acquired the loan and exercised remedies thereunder in an effort to acquire the Debtors' business and in a manner that caused injury to the Debtors and the value of their business. Based on this premise, the Complaint asserts: (i) a cause of action for economic duress, (ii) a cause of action for breach of the covenant of good faith and fair dealing, (iii) a cause of action for unjust enrichment, (iv) a cause of action for recovery, as an unauthorized transfer, of all funds paid to RWHI on its claims in the Debtors' cases, and (v) disallowance of the proof of claim filed by RWHI on account of the acquired loan. The Complaint also names as defendants RWHI's affiliates, Safety Supply Corporation ("Safety Supply"), and Radians, Inc. ("Radians") (together with Safety Supply and RWHI, "Defendants").
Defendants have filed their motion to dismiss the Complaint (the "Motion to Dismiss" or "MTD"). Adv. Dkt. 5. Defendants argue that Safety Supply and Radians should be dismissed from this lawsuit because the Complaint does not allege enough facts to support a claim against these affiliates of RWHI. Defendants further argue that all claims against them should be dismissed because: (i) the claims were released pursuant to the terms of a prepetition release executed by the Debtors, (ii) the claims were released pursuant to the terms of the agreed order approving the Debtor's postpetition financing, and (iii) the Complaint fails to adequately plead causes of action on which relief can be granted.
*649 The Court has reviewed and considered all the pleadings filed in support of and in opposition to the Motion to Dismiss, the oral arguments of counsel, and the documents identified in Section IV below. For the reasons set forth below, the Motion to Dismiss will be granted in part and denied in part, as specified below.
II. BACKGROUND
On September 8, 2017 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. ICPW CA developed and manufactured high-performance task-specific gloves and apparel in a variety of end markets. See Omnibus Declaration of L. Geoff Greulich in Support of Debtors' Emergency "First Day" Motions ("Greulich Decl."), ¶ 3.[5] ICPW NV was a publicly-traded company whose only business was owning all shares in ICPW CA. See Greulich Decl., Case Dkt. 6, ¶ 2. The Debtors' business was headquartered in Farmers Branch, Texas. Id.
In connection with commencement of these cases, the United States Trustee ("UST") appointed (1) the Equity Committee, see Case Dkt. 59; and (2) an official committee of unsecured creditors ("Creditors' Committee"). See Case Dkt. 62.
In late 2014, the Debtors obtained a revolving credit facility from Capital One, N.A. ("Capital One"), secured by substantially all of the Debtors' assets. Greulich Decl., Case Dkt. 6, ¶ 12. On July 25, 2017, Capital One assigned the loan to RWHI. Id. , ¶ 14. As of the Petition Date, RWHI was the Debtors' only secured creditor. Id. , ¶ 23. RWHI filed identical proofs of claim in each of the Debtors' cases. See Claim No. 20-1 in Case No. 1:17-bk-12408-MB; Claim No. 7-1 in Case No. 1:17-bk-12409-MB). Both proofs of claim asserted a claim amount of $ 3,464,093.28, owing as of the Petition Date (collectively, the "Claim").
Shortly before the Petition Date, the Debtors and RWHI entered into an asset purchase agreement ("APA") pursuant to which RWHI agreed to serve as a stalking horse, i.e., purchase the Debtors' assets subject to overbid and court approval. Greulich Decl., Case Dkt. 6, ¶ 27. The APA provided for certain bidding procedures applicable to the process, and a breakup fee of $ 500,000 ("Breakup Fee") if RWHI was not the winning bidder in an auction for the Debtors' assets, or if the Debtors proceeded with a plan of reorganization. See Greulich Decl. at 271-72..
On September 28, 2017, the Court entered an order approving the form of the APA and the bidding procedures to which the Debtors and RWHI agreed, including the Breakup Fee. See Case Dkt. 71 ("Bidding Procedures Order"). On October 30, 2017, the Court conducted an auction and thereafter approved the sale of substantially all the Debtors' assets to a purchaser other than RWHI. See Sale Order, Case Dkt. 177. The winning bidder agreed to purchase substantially all of the Debtors' assets for $ 25,500,000. Id. That sale closed on November 14. 2017. See Case Dkt. 237.
Also before the Petition Date, the Debtors and RWHI entered into the DIP Agreement, pursuant which RWHI agreed to provide postpetition financing while the Debtors marketed the opportunity to overbid for the assets. Greulich Decl., Case Dkt. 6, ¶ 23. On October 6, 2017, the Court entered its final order approving the DIP Agreement, the form of which was agreed *650 to by the parties. See Case Dkt. 87 ("Final DIP Order"). Among other things, the Final DIP Order contained language (i) granting standing to the Equity Committee to pursue certain claims of the Debtors' estates (the "Estates") against RWHI, provided an action on such claims was commenced within a specified time period, and (ii) subject to such rights, waiving certain claims against RWHI:
kk. On or before the date that is sixty (60) days from the date of the entry of this Final Financing Order (the "Lookback Period"), the Official Committee of Unsecured Creditors and the Official Committee of Equity Holders shall have standing individually and on behalf of Debtors' Estates to object to, challenge, or seek to avoid the amount, validity, or enforceability of the Pre-Bankruptcy Secured Debt (or any portion thereof) or any of the liens and security interests created under the Pre-Bankruptcy Secured Debt and to bring any other claim that they have against Radians, individually or on behalf of the Debtors' Estates (separately and collectively, a "Challenge"). If no such action, objection or other Challenge is commenced by either the Official Committee of Unsecured Creditors or the Official Committee of Equity Holders within the Lookback Period, the Pre-Bankruptcy Secured Debt will be deemed and adjudicated finally and indefeasibly as valid and enforceable, the liens and security interests created under the Pre-Bankruptcy Secured Debt in the Collateral securing the Pre-Bankruptcy Secured Debt will be deemed and adjudicated finally and indefeasibly as valid, enforceable and perfected liens and security interests in that Collateral, and any affirmative claim(s) or cause(s) of action of any kind against Radians with respect to the Pre-Bankruptcy Secured Debt, or otherwise, and the liens and security interests securing the Pre-Bankruptcy Secured Debt, or any payment received by Radians will be forever barred. As provided in this Final Financing Order, the Debtors have waived and released, and shall be forever barred from asserting, any right to object to, challenge or seek to avoid, the amount, validity, or enforceability of the Pre-Bankruptcy Secured Debt or the liens and security interests in the Collateral securing the Pre-Bankruptcy Secured Debt. Except as otherwise may have been determined by the Court in the proceedings referenced above, and subject to further Order of the Court, in the event any payment made to, or other amount or value received by Radians from or for the account of any of the Debtors is avoided, rescinded, set aside or must otherwise be returned or repaid by Radians, whether in the Cases or any other proceedings, the indebtedness repaid shall be allowed as a claim in accordance with existing law. Any of Radians' claims, liens, rights, and remedies under the Loan Documents which survive such action shall be reinstated and fully preserved.
Case Dkt. 87 at 19 (Final DIP Order).
On December 5, 2017, the Equity Committee filed the Complaint and initiated the instant adversary proceeding. The Court subsequently confirmed the Plan, which dissolved the Equity Committee, created a trust solely for the benefit of the shareholders of ICPW NV, and transferred to the trust the rights of the Equity Committee to prosecute this action. See Case Dkt. 438, 442. Thereafter, the parties entered into a stipulation substituting Matthew Pliskin, as trustee under the trust created by the Plan, as Plaintiff. See Adv. Dkt. 42.
III. THE ALLEGATIONS OF THE COMPLAINT
What follows are the relevant allegations from the Complaint. Safety Supply is the *651 parent company of RWHI and Radians. Complaint, ¶¶ 4-6. Defendants acted under the same management and share responsibility for each other's actions. Id. , ¶ 13. RWHI was paid $ 5,343,988.19 upon the closing of the sale of the Debtors' assets. Id. , ¶ 7.
Defendants manufacture safety equipment and apparel. Id. , ¶ 12. In 2007 or 2008, the representatives of the Debtors and RWHI met to discuss if the two businesses might benefit from a strategic transaction. Id. , ¶ 14. The Debtors decided not to pursue such a transaction, but over the next several years RWHI communicated its interest in acquiring the Debtors' brands or assets. Id.
Between November 2016 and April 2017, Capital One agreed to waive defaults when the Debtors breached the debt service coverage ratio ("DSCR") covenant of the Loan Agreement. Id. , ¶ 19. On April 11, 2017, Capital One agreed to replace the DSCR covenant with a 12-month trailing adjusted EBITDA covenant. Id. In May 2017, Capital One demonstrated it was willing to work with the Debtors through financial difficulties when it extended the loan's maturity date to July 2018. Id.
In May 2017, RWHI prepared to go public with an offer to purchase ICPW NV's shares for 27.5 cents per share. Id. , ¶ 15. Around the time RWHI was preparing its stock purchase offer, the Debtors' board of directors received anonymous reports of accounting irregularities that resulted in inflated revenue figures on the Debtors' financial statements. Id. , ¶ 16. Upon investigating the reports, the Debtors filed a Form 8-K Report with the Securities and Exchange Commission on or about July 6, 2017, dated June 29, 2017, disclosing the financial irregularities, the termination of the employment of the Debtors' chief executive officer and chief financial officer, and the appointment of new individuals to those positions. Id.
Days later, on July 10, 2017, RWHI's CEO wrote the Debtors' chairman to say RWHI did not want to wait for the financial reports to be restated, and RWHI was willing to consider increasing its 27.5 cents per share purchase offer. Id. , ¶ 17. Meanwhile, RWHI contacted Capital One to express its interest in purchasing the Debtors' loan. Id. , ¶ 18. RWHI and Capital One quickly reached an agreement whereby RWHI would purchase the loan and waive any recourse against Capital One related to the uncertainties presented by the misstatements in the Debtors' financial statements. Id. , ¶ 20. RWHI purchased the loan from Capital One on July 25, 2017, and Radians wired to Capital One an amount of money equivalent to the outstanding balance on the loan. Id. , ¶ 21. Neither Defendants nor their managers had ever before acted as a commercial lender. Id.
The next day, on July 26, 2017, counsel for RWHI sent the Debtors a letter declaring the Debtors in default under the loan due to the previously disclosed misstated financial reports, accelerating the loan, and demanding immediate payment of the $ 3,688,195.22 outstanding balance in full. Id. , ¶ 22. RWHI knew the Debtors had no means by which to pay the loan since the Debtors' last financial statements showed a cash balance of less than $ 300,000. Id. Over the next four weeks, the Debtors negotiated with several prospective lenders to either replace or supplement the existing debt, but RWHI did not allow that to happen. Id. , ¶ 23. Instead, RWHI agreed only to two one-week forbearances-one signed August 1, the other signed August 14-even though the Debtors told RWHI they needed two to three weeks to arrange financing. Id. Meanwhile, RWHI continued to make offers to purchase the Debtors. Id.
*652 RWHI began sweeping cash from the Debtors' bank accounts on August 24, 2017. Id. , ¶ 24. RWHI knew the Debtors could not operate without cash, but it refused to stop sweeping the cash because it intended to force the Debtors to shut down or turn over their assets to RWHI. Id. RWHI's actions-in accelerating the loan, agreeing only to unworkable one-week forbearances, and sweeping the Debtors' bank accounts-were strictly for RWHI's own commercial advantage and were unjust, oppressive, and in bad faith. Id. , ¶ 25. Left with no funds and no other alternative, the Debtors informed RWHI that they intended to file for bankruptcy protection, and the parties negotiated an agreement whereby RWHI would be the stalking horse bidder in a bankruptcy sale. Id. , ¶ 26. Had RWHI not forced the Debtors into bankruptcy, the Debtors would have been able to negotiate refinancing of the loan or a sale of the Debtors' assets on terms more favorable than those realized in the bankruptcy auction. Id. , ¶ 28.
RWHI improperly used the acceleration and cash sweeping provisions of the Loan Agreement to further RWHI's own economic interests because RWHI was only interested in acquiring the Debtors' assets. See id. , ¶¶ 30-34. RWHI's actions forced the Debtors into bankruptcy. Id. In bankruptcy, the Debtors' assets were sold for a price that was less than the value of the assets before RWHI exercised these remedies. Id.
IV. LEGAL STANDARDS
A. Federal Rule of Civil Procedure Rule 8
Under Federal Rule of Civil Procedure 8, made applicable here by Federal Rule of Bankruptcy Procedure 7008, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ; see also Eclectic Properties E., LLC v. Marcus & Millichap Co. , 751 F.3d 990, 996 (9th Cir. 2014).
B. Federal Rule of Civil Procedure Rule 12(b)(6)
A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), applicable here under Federal Rule of Bankruptcy Procedure 7012(b), challenges the sufficiency of the allegations set forth in the complaint. "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " Johnson v. Riverside Healthcare Sys ., 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't , 901 F.2d 696, 699 (9th Cir. 1990) ).
In resolving a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. Johnson , 534 F.3d at 1122 ; Knox v. Davis , 260 F.3d 1009, 1012 (9th Cir. 2001). On the other hand, the court is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. Twombly , 550 U.S. at 555-57, 127 S.Ct. 1955 ; Clegg v. Cult Awareness Network , 18 F.3d 752, 754-55 (9th Cir. 1994).
"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."
*653 Twombly , 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). "In practice, a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Id . at 562, 127 S.Ct. 1955 (emphasis added) (quoting Car Carriers, Inc. v. Ford Motor Co. , 745 F.2d 1101, 1106 (7th Cir. 1984) ).
In Ashcroft v. Iqbal , 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court elaborated on the Twombly standard as follows:
To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.
Id . at 678, 129 S.Ct. 1937 (citations and internal quotation marks omitted).
If dismissal is granted under Rule 12(b)(6), leave to amend should be allowed unless the pleading may not possibly be cured by the allegation of other facts. Lopez v. Smith , 203 F.3d 1122, 1130 (9th Cir. 2000). If amendment would be futile, dismissal may be ordered with prejudice. Dumas v. Kipp , 90 F.3d 386, 393 (9th Cir. 1996).
A complaint may be dismissed under Rule 12(b)(6) based on an affirmative defense "only if the defendant shows some obvious bar to securing relief on the face of the complaint." ASARCO, LLC v. Union Pacific R. Co. , 765 F.3d 999, 1004 (9th Cir. 2014). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." Id. (citing Scott v. Kuhlmann, 746 F.2d 1377, 1378 (9th Cir.1984) ).
V. DISCUSSION
A. Scope of Materials Considered
In considering a Rule 12(b)(6) motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd. , 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citations omitted). "Certain written instruments attached to pleadings may be considered part of the pleading." United States v. Ritchie , 342 F.3d 903, 908 (9th Cir. 2003). "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." Id. The Court may consider such a document on which the complaint "necessarily relies" if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." United States v. Corinthian Colleges , 655 F.3d 984, 999 (9th Cir. 2011). "The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under 12(b)(6)." United States v. Ritchie , 342 F.3d at 908.
Here, the Complaint refers extensively to the loan documents and revisions between the Debtors and Capital One, and the forbearance agreements between the Debtors and RWHI. Those documents are central to Plaintiff's claims. The Complaint *654 defines "Loan Agreement" as the "Revolving Loan and Security Agreement, first entered as of November 28, 2014 (as later amended, the 'Loan Agreement')." Complaint, ¶ 11. The Complaint repeatedly references the "Loan Agreement" then makes the following allegations: (1) under the First Cause of Action: "Radians' actions as a lender to [Debtors] constituted improper use of the Loan Agreement's acceleration and sweeping provisions for Radians' own commercial advantage over the [Debtors]," id. , ¶ 31; (2) under the Second Cause of Action: "The Loan Agreement sold by Capital One to Radians Wareham Holding, Inc. included an implied covenant of good faith and fair dealing," id. , ¶ 36, and "Radians' actions deprived [Debtors] of the benefits of the Loan Agreement, improperly invoking the acceleration and sweeping provisions, and contrary to the standards of conduct established while Capital One held the loan, for Radians' own commercial advantage over [Debtors]," id. , ¶ 38; and (3) under the Third Cause of Action: Radians' wrongful actions include using the acceleration and sweeping provisions of the Loan Agreement to coerce unreasonable terms and other consideration from [Debtors]," id. , ¶ 43. The Complaint also alleges that RWHI would only agree to two "unworkable one-week forbearances," "one signed August 1st, the other signed August 14th." Id. , ¶¶ 23, 25. Plaintiff seeks to void the forbearance agreements based on duress, see Opp. at 18-19, and describes them as containing "unreasonable terms." Complaint, ¶ 43. Throughout briefing and extensive oral argument, no party has questioned the authenticity of the loan documents, revisions, or forbearance agreements. To the contrary, Plaintiff implicitly admits the authenticity of the documents by arguing that certain provisions were misused and others should be voided.
Thus, the Court has considered the following documents in ruling on the Motion to Dismiss:[6]
(a) Revolving Loan and Security Agreement made as of November 28, 2014, by and among Debtors and Capital One, N.A.[7]
(b) Second Amended and Restated Revolving Line of Credit Note in favor of Capital One, N.A. dated April 11, 2017, in the principal amount of $ 8,000,000.00.[8]
(c) First Modification Agreement dated as of June 15, 2015, by and among Debtors and Capital One, N.A.[9]
(d) Second Modification Agreement dated as of March 16, 2016, by and among Debtors and Capital One, N.A.[10]
(e) Waiver and Third Modification Agreement dated as of November 28, 2016, by and among Debtors and Capital One, N.A.[11]
(f) Waiver and Fourth Modification Agreement dated as of February *655 23, 2017, by and among Debtors and Capital One, N.A.[12]
(g) Limited Waiver and Fifth Modification Agreement dated as of April 11, 2017, by and among Debtors and Capital One, N.A.[13]
(h) Sixth Modification Agreement dated as of May 10, 2017, by and among Debtors and Capital One, N.A.[14]
(i) General Assignment and Assumption of Loan Documents made as of July 25, 2017, by Capital One, N.A., to and accepted by RWHI.[15]
(j) Forbearance and Modification Agreement dated August 1, 2017, by and among RWHI and Debtors.[16]
(k) Forbearance Agreement dated August 14, 2017, by and among RWHI and Debtors.[17]
B. Governing Law
The parties agree that the substantive law of Texas applies to the three state-law causes of action by virtue of a choice of law provision in the Loan Agreement. See Adv. Dkt. 6 at 57, Section 13.5. The Complaint alleges that the "Loan Agreement provided it was to be governed by the laws of the State of Texas (Section 13.[5] )." Complaint, ¶ 1. Similarly, Defendants admit that "[t]he tort claims are governed by Texas law." MTD at 3 (citing Section 13.5 of the Loan Agreement). As for Plaintiff's objection to claim, bankruptcy law applies in the first instance, although determination of the objection may require the examination of state law. As for Plaintiff's claim for the recovery of an unauthorized postpetition transfer, bankruptcy law provides the rule of decision.
C. Dismissal of Safety Supply and Radians
As a preliminary matter, Defendants argue that the Complaint should be dismissed as to Safety Supply and Radians because "RWHI undertook all of the allegedly improper actions," MTD at 14, and these two affiliates "did not participate in the purchase of the Subject Loan and are not parties to any agreement as to the Subject Loan," id. at 3.[18] In response, *656 Plaintiff argues that all three Defendants "acted together, for the benefit of common ownership and under the orders of common management," and they should either be jointly and severally liable under a theory of civil conspiracy, or assigned proportionate liability based on each defendant's percentage of responsibility.[19] Opp. at 8.
1. Civil Conspiracy
As a threshold matter, the Court observes that Plaintiff's civil conspiracy theory of liability with respect to Safety Supply and Radians was raised for the first time in Plaintiff's opposition to the Motion to Dismiss (the "Opposition"). The Complaint itself does not use the term civil conspiracy, identify the elements of a civil conspiracy, or assert facts adequate to satisfy the elements of a civil conspiracy. Thus, the civil conspiracy theory asserted in Plaintiff's opposition derives from outside the Complaint and is not a proper defense to the inadequacy of the Complaint. See Broam v. Bogan , 320 F.3d 1023, 1026 n. 2 (9th Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.") (quoting Schneider v. Cal. Dep't. of Corr., 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) ). Moreover, even if the Court assumes that Plaintiff attempted in some measure to plead a civil conspiracy, its allegations are woefully inadequate to the task.
Under Texas law, the elements of a civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." Tri v. J.T.T. , 162 S.W.3d 552, 556 (Tex. 2005). Civil conspiracy is a derivative tort. Tilton v. Marshall , 925 S.W.2d 672, 681 (Tex. 1996). "That is, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." Hotze v. Miller , 361 S.W.3d 707, 718 (Tex. App. 2012, pet. denied).[20] "There must be some act committed by one or more of the parties to advance or pursue or to implement the agreement ." Rogers v. R.J. Reynolds Tobacco Co. , 761 S.W.2d 788, 796 (Tex. App. 1988, writ denied) (original emphasis), disapproved of on other grounds , Triplex Commc'ns, Inc. v. Riley , 900 S.W.2d 716 (Tex. 1995).[21] The meeting of the minds must involve a specific intent "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Juhl v. Airington , 936 S.W.2d 640, 644 (Tex. 1996) (quoting Triplex Commc'ns, Inc. , 900 S.W.2d at 719 ).
*657 "Merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy." Id. ; see also Angel v. La Joya Indep. Sch. Dist. , 717 F. App'x 372, 380 (5th Cir. 2017) (under Texas law, "Plaintiffs could have stated a claim for civil conspiracy if they alleged a 'meeting of the minds' with respect to the reason for the adverse actions").
The Complaint alleges that Safety Supply is the parent company of RWHI and Radians, Complaint, ¶¶ 4-6, and "[a]s corporate members of the same privately-owned organization, [RWHI], Radians and Safety Supply Corporation acted under the same management and share responsibility for each related entity's actions regarding the [Debtors]," id. , ¶ 13. The Complaint alleges that "[RWHI], through [Safety Supply], prepared to go public with the offer [to purchase the shares of ICPW NV]," id. , ¶ 15, and that Radians wired money to Capital One when RWHI purchased the Debtors' loan from Capital One, id. , ¶ 21.
These factual allegations do not satisfy the elements for a civil conspiracy under Texas law. First, the allegation that Safety Supply and Radians acted under the same management does not satisfy any element of a civil conspiracy. At best it suggests that RWHI may have directed its wholly owned subsidiaries to undertake certain actions for the benefit of RWHI, which actions were not themselves tortious. Second, the allegation that the three Defendants "share responsibility" for each other's actions is not a factual allegation. It is a legal conclusion, which the Court is not bound to accept as true on a Rule 12(b)(6) motion. Ashcroft v. Iqbal , 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Third, the Complaint does not allege any meeting of the minds between the three Defendants regarding a common objective or course of action, the substance of their agreement, or that it was made by each participant with a specific intent "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."
The alleged fact that Safety Supply sought to purchase shares of ICPW NV arguably demonstrates that RWHI sought to use its wholly owned subsidiary to acquire the Debtors' business. It does not establish an agreement between the two entities to achieve any unlawful purpose or any lawful purpose by unlawful means. Likewise, the alleged fact that Radians wired the money used by RWHI to acquire the Debtors' loan from Capital One, demonstrates little more than that Radians facilitated the purchase of that loan on behalf of its wholly owned parent. It does not establish a meeting of the minds regarding either an unlawful purpose or a lawful purpose by unlawful means. As such, the Complaint fails to provide Defendants with "fair notice" of the civil conspiracy theory that was subsequently asserted in the Opposition or the "grounds upon which [that theory] rests." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
Notably, it is not clear under Texas law whether a parent can even conspire with its wholly owned subsidiary. See Grizzle v. Texas Commerce Bank , 38 S.W.3d 265, 284 (Tex. App. 2001), rev'd in part on other grounds , 96 S.W.3d 240 (Tex. 2002) (noting disagreement among Texas courts). Some Texas courts have adopted a per se prohibition on civil conspiracy between a corporate parent and its subsidiaries, relying on Copperweld Corporation v. Independence Tube Corp. , 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), a United States Supreme Court case interpreting a federal antitrust statute (the Sherman Act). See, e.g. , *658 Atl. Richfield Co. v. Misty Prod., Inc. , 820 S.W.2d 414, 420 (Tex. App. 1991, writ denied) ; Bank One, Texas, N.A. v. Stewart , 967 S.W.2d 419, 430 (Tex. App. 1998, pet. denied) (citing Atl. Richfield Co. v. Misty Prod., Inc. , 820 S.W.2d at 420 ). Other courts have held that such a per se prohibition is "restricted to the antitrust context and [is] not applicable to common law conspiracies." See, e.g. , Atl. Richfield Co. v. Long Trusts , 860 S.W.2d 439, 447 (Tex. App. 1993, writ denied) ; Metro. Life Ins. Co. v. La Mansion Hotels & Resorts, Ltd. , 762 S.W.2d 646, 652 (Tex. App. 1988, writ dismissed) ("We are here concerned with an alleged conspiracy under common law theories. Under the common law, a parent corporation and its subsidiary are separate legal entities."). The Texas Supreme Court has yet to weigh in on the issue, and the two Texas federal courts to do so have reached contrary conclusions. Compare ASARCO v. Ams. Mining Corp. , 382 B.R. 49, 78-79 (S.D. Tex. 2007) (holding that Texas Supreme Court is likely to find that a parent and subsidiary can conspire with each other), with Block v. Alpharma, Inc. , Civil Action No. 3:02-CV-1077-N, 2004 WL 555480, 2004 U.S. Dist. LEXIS 31174 (N.D. Tex. Mar. 17, 2004) (opposite conclusion).
But the Court does not need to adjudicate this issue at this juncture. Because the Complaint does not identify civil conspiracy as a basis for liability against Safety Supply and Radians, and the Complaint does not plead facts that would put Defendants on notice that a civil conspiracy has been alleged, the Court need only rule that the civil conspiracy argument asserted in the Opposition is inadequate to remedy the Complaint.
2. Proportionate Liability
Chapter 33 of the Texas Civil Practices and Remedies Code provides a proportionate responsibility scheme that generally applies to all common law torts and certain statutory torts. Tex. Civ. Prac. & Rem. Code § 33.002 ; see PEMEX Exploracion y Produccion v. Murphy Energy Corp. , 923 F.Supp.2d 961, 980 (S.D. Tex. 2013), aff'd , 595 Fed. App'x 445 (5th Cir. 2015). "[T]he statute requires the trier of fact to determine the percentage of responsibility of each claimant, defendant, settling person, and responsible third party who has been designated in accordance with the statute." Arceneaux v. Pinnacle Entm't, Inc. , 523 S.W.3d 746, 748 (Ct. App. 2017). The purpose of the statute is to "hold each party responsible only for the party's own conduct causing injury." Id. (internal quotations omitted). Although the Complaint alleges that Radians wired money to Capital One to acquire the loan, and Safety Supply prepared a share purchase offer, neither of these actions is itself tortious and therefore does not support apportioning liability to Safety Supply or Radians.
* * *
Based on the foregoing, the Court will grant the Motion to Dismiss with respect to Safety Supply and Radians, but will grant Plaintiff leave to amend his complaint to allege facts that, if established, would show either (i) the existence of a civil conspiracy justifying the imposition of liability on Safety Supply and/or Radians for wrongful acts committed by RWHI, or (ii) tortious acts by Safety Supply and/or Radians that would substantiate an apportionment of liability to either or both of those entities.
D. Defendants' Arguments That the Entire Action is Barred
Defendants argue that Plaintiff is barred from bringing the Complaint in its entirety for two separate reasons. First, Defendants *659 argue that the equity holders of ICPW-NV (a) have not suffered any direct injury that would confer standing on them to pursue any claim, and (b) under Texas law, they do not have standing to pursue a claim for injuries to either of the Debtors. Second, Defendants argue that the Debtors voluntarily released their claims against Defendants, both prepetition and postpetition. For this reason, Defendants argue, none of the claims asserted in the Complaint is an enforceable claim of the Estates. Each of these arguments is addressed in turn.
1. Standing
As noted, Plaintiff is the successor in interest to the Equity Committee. The beneficiaries of the trust for which Plaintiff serves as trustee are the former holders of the equity in ICPW-NV. Defendants rely on these facts to argue that Plaintiff does not have standing to pursue the claims asserted in the Complaint. Defendants argue that Plaintiff cannot have standing because the equity holders have not been directly injured by Defendants and do not otherwise have standing as equity holders, under Texas law, to sue for damages to the corporation. But these arguments assume incorrectly that Plaintiff is asserting causes of action that originated with the equity holders themselves. To the contrary, the claims that Plaintiff is pursuing on behalf of the plan trust are claims of the Estates. In re Spaulding Composites Co. , 207 B.R. 899, 903 (9th Cir. BAP 1997). The Equity Committee was granted the right to pursue claims of the Estates under the Final DIP Order, and that right was transferred to Plaintiff pursuant to the Plan. That the ultimate beneficiary of any recoveries realized by Plaintiff are former equity holders of ICPW-NV is of no moment.
2. Releases
A release is an affirmative defense that must be raised in the answer or a responsive pleading. Fed. R. Civ. P. 8(b), (c) ; see Tex. R. Civ. P. 94. A complaint may be dismissed under Rule 12(b)(6) based on an affirmative defense "only if the defendant shows some obvious bar to securing relief on the face of the complaint." ASARCO, LLC v. Union Pacific R. Co. , 765 F.3d 999, 1004 (9th Cir. 2014). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." Id. (citing Scott v. Kuhlmann, 746 F.2d 1377, 1378 (9th Cir.1984) ).
a. Prepetition Releases
Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The scope of section 541 is "broadly defined and includes causes of action." CBS, Inc. v. Folks (In re Folks) , 211 B.R. 378 (9th Cir. BAP 1997) (citing United States v. Whiting Pools, Inc. , 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) ). The nature of the property rights that become assets of an estate are defined by state law. Id. (citing Butner v. United States , 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ). Thus, if a cause of action is released by the debtor prepetition, it will not be a "legal or equitable interest of the debtor in property as of the commencement of the case." See 11 U.S.C. § 541(a)(1).
In Texas, a "release, valid on its face, until set aside, is a complete bar to any later action based on matters covered by the release." Deer Creek Ltd. v. North Am. Mortgage Co. , 792 S.W.2d 198, 203 (Tex. App. 1990, no writ) (citing *660 Schmaltz v. Walder , 566 S.W.2d 81, 83 (Tex. App. 1978, writ ref'd n.r.e.[22] ) ). To release a claim, a release provision must "mention" the claim. D.R. Horton-Texas, Ltd. v. Savannah Props. Assocs., L.P. , 416 S.W.3d 217, 226 (Tex. App. 2013, no pet.). "Although releases include claims existing at the time of execution, they may also include unknown claims and damages that develop in the future." Id. (citing Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. , 20 S.W.3d 692, 698 (Tex. 2000) ).
Defendants contend that the claims asserted in the Complaint were released by the Debtors prior to the commencement of these cases and therefore never became assets of the Debtors' estates. Specifically, Defendants point to language in the prepetition Forbearance Agreements executed by the Debtors and RWHI, in which the Debtors (i) acknowledge that they have no defenses to the payment obligations under their prepetition loan, and (ii) release any claims they had against RWHI at the time they executed such agreements. The relevant language in the forbearance agreements reads as follows:
6. Acknowledgement of Lack of Defenses. [Debtors] acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Borrower Claims") that can be asserted to reduce or eliminate all or any part of its liability to repay any of the Obligations to [RWHI] or seek affirmative relief for damages of any kind or nature from [RWHI], which Borrower Claims arise out of or are related to the Loan Documents or, more generally, [Debtors'] relationship with [RWHI]. To the extent that any such Borrower Claims exist as of the Effective Date, [Debtors] acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Paragraph14 hereto....
14. Release of Lender.
(a) Except with respect to [RWHI's] obligations set forth in this Agreement, in consideration of the agreements of [RWHI] contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, [Debtors], and each of their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges [RWHI], and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives *661 ( [RWHI] and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which such [Debtors] or any of their respective heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.
August 1 Forbearance Agreement at ¶¶ 6, 14; August 14 Forbearance Agreement at ¶¶ 6, 12 (the "Prepetition Releases").
Although the releases are broad and would appear to cover the claims presented in the Complaint, Plaintiff argues that the Prepetition Releases do not bar this action because (i) the Prepetition Releases are not binding on Plaintiff as a matter of bankruptcy policy and/or because Plaintiff was not a party to the releases; (ii) Plaintiff's claims post-date the Prepetition Releases; and (iii) the Prepetition Releases are voidable based on coercion and duress.[23]
i. Bankruptcy Policy
First, Plaintiff argues that the Prepetition Releases do not apply to the claims asserted in the Complaint as a matter of bankruptcy policy. Opp. at 17. The Court disagrees. Plaintiff mistakenly relies on several cases applying the general principle that because the Bankruptcy Code seeks to provide a "fresh start" to "the honest but unfortunate debtor," Grogan v. Garner , 498 U.S. 279, 286-287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), "[i]t is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code." Bank of China v. Huang (In re Huang) , 275 F.3d 1173, 1177 (9th Cir. 2002) ; see Continental Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.) , 671 F.3d 1011, 1026 (9th Cir. 2012) (reaffirming Huang ); In re Cole , 226 B.R. 647, 651-654 & nn. 6-7 (9th Cir. BAP 1998) (citing sixteen cases for the proposition that "prepetition waivers of the bankruptcy discharge ... [and] other bankruptcy benefits ... are ... unenforceable").[24]
*662 In Huang , the debtor entered into a detailed prepetition settlement agreement in which he agreed he would not file for bankruptcy protection and that, if he did, the debt evidenced by the settlement agreement would not be dischargeable under Bankruptcy Code section 523(a)(2)(A). 275 F.3d at 1176-77. The debtor nonetheless sought bankruptcy protection. The Ninth Circuit refused to enforce the terms of the agreement because "[i]t is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code." Id. at 1177. The court explained that the "prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive [bankruptcy protection]." Id. ; see also In re Pease , 195 B.R. 431, 434-35 (Bankr. D. Neb. 1996) ("Any attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable. The Bankruptcy Code preempts the private right to contract around its essential provisions.").
The Ninth Circuit reiterated this policy statement in Thorpe , in which the court of appeals held that the debtor's transfer of claims to a plan trust pursuant to Bankruptcy Code section 524(g) did not give rise to a claim for damages based on a prepetition agreement promising not to assign those claims. 671 F.3d at 1026 (citing In re Huang , 275 F.3d at 1177 ). This is because enforcement of the prepetition agreement in this manner-although the agreement did not mention specific rights in bankruptcy-would effectively waive the rights of a debtor to use the trust and injunction mechanism under Bankruptcy Code section 524(g). It also would violate the provisions of Bankruptcy Code section 541(c) which abrogate prepetition anti-assignment restrictions that would limit a debtor's right to transfer its interests in bankruptcy. See 671 F.3d at 1026-27.
But these cases are distinguishable-as are the other cases cited by Plaintiff. These courts declined to enforce either (i) a prepetition waiver by the debtor of specifically-identified rights or protections under the Bankruptcy Code, or (ii) a prepetition waiver by the debtor of nonbankruptcy rights which, if enforced, would effectively deny the debtor rights or protections created by the Bankruptcy Code. None of these cases involve a debtor, its successor, or a third party being permitted to pursue nonbankruptcy claims that were released prepetition by the debtor in accordance with state law.[25]
*663 Here, the Prepetition Releases do not purport to affect the Debtors' rights under the Bankruptcy Code (e.g., preempting the automatic stay, granting a blocking right, precluding a bankruptcy trustee's avoidance powers, etc.), but instead release prepetition state law causes of action, such as the claims asserted in the Complaint for duress, breach of the covenant of good faith and fair dealing, and unjust enrichment claims. The prepetition release of these state-law claims may have had an economic impact on the Debtors and ultimately the Estates (when they later came into existence). But the prepetition release of those claims is not equivalent to the express waiver of statutory rights and protections under the Bankruptcy Code or even the effective waiver of such rights and protections. Instead, the releases resulted in certain assets (i.e., state law causes of action) not becoming part of the Estates. These facts do not raise the same policy concerns at issue in In re Huang and In re Thorpe Insulation, Co.
The case on which Plaintiff most heavily relies actually supports the Court's analysis. See Minnesota Corn Processors, Inc. v. American Sweeteners, Inc. (In re American Sweeteners, Inc.) , 248 B.R. 271 (Bankr. E.D. Pa. 2000). The debtor and a creditor executed a prepetition release pursuant to which the debtor released all claims against the creditor for any conduct occurring before the date of the settlement agreement. Id. at 275. In the context of a dispute over discovery, the court held that the prepetition release was a "complete defense to any action on the claims released," but that the release was not effective to preclude a claim of equitable subordination under Bankruptcy Code section 510(c). Id. at 275-78.[26] In other words, the court gave effect to the case law that prohibits a prepetition waiver of rights and protections conferred by the Bankruptcy Code, but otherwise enforced the prepetition waiver of claims. Here, enforcement of the Prepetition Waivers effectuates only a prepetition waiver of state law claims and does not deprive any party of any rights or protections conferred by the Bankruptcy Code.
Finally, irrespective of whether the Prepetition Releases are enforceable, Plaintiff contends that he should not be bound by those releases because he was not a party to them. The Court finds this argument unpersuasive. Having made clear that Plaintiff is only pursuing claims that were property of the Estates, see Opp. at 20, Plaintiff cannot now argue that these claims are free of any defenses to which they were subject when they were still in the hands of the Debtors or the Estates. Plaintiff effectively has stepped into the shoes of the Debtors and the Estates and takes these claims how he finds them. See 11 U.S.C. § 541(a)(1) (estate includes only those "legal and equitable interests of the debtor in property as of the commencement of the case."). In this instance, it appears the claims were waived and released before they ever became property of the Estates. Plaintiff cannot avoid this reality.
ii. Time at Which the Claims Accrued
Second, Plaintiff argues that the Prepetition Releases do not bar his claims because the Debtors' injuries "occurred upon the closing of the sale of [the Debtors']
*664 assets, but no earlier than upon execution and effectiveness of the [asset purchase agreement among the Debtors and RWHI], on or about the Petition Date." Opp. at 19. In other words, Plaintiff argues that the Debtors' injuries manifested themselves after the Prepetition Releases were executed. Defendants argue that Plaintiff's claims fall within the coverage of the Prepetition Releases because the allegedly wrongful acts giving rise to Plaintiff's claims occurred before the Prepetition Releases were executed. The Court agrees with the Defendants.
In Texas, "a cause of action generally accrues at the time when facts come into existence authorizing a claimant to seek a judicial remedy." Murray v. San Jacinto Agency, Inc. , 800 S.W.2d 826, 828 (Tex. 1990). A plaintiff's cause of action accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." S.V. v. R.V. , 933 S.W.2d 1, 4 (Tex. 1996). "The fact that damage may continue to occur for an extended period after denial does not prevent limitations from starting to run." Murray v. San Jacinto Agency, Inc. , 800 S.W.2d at 828.[27]
Here, the Complaint alleges that RWHI's wrongful actions included "accelerating the loan, agreeing only to unworkable one-week forbearances and sweeping [the Debtors'] bank accounts," Complaint, ¶ 25. According to the Complaint, these actions first occurred before the Prepetition Releases were executed. The Complaint alleges that these actions injured the Debtors by "depriv[ing the Debtors] of the benefits of the Loan Agreement," id. , ¶ 38; by "coerc[ing] unreasonable terms and other consideration from [the Debtors], including a pre-payment fee and the Break-Up Fee," ¶ 43; and by providing RWHI with a commercial advantage over the Debtors. Id. , ¶¶ 31, 38. Under Texas law, regardless of whether additional injuries manifested themselves later, the claims based on RWHI's pre-release conduct accrued before the Prepetition Releases were executed.
Even if this were not the case, Texas law permits a release to be valid against unknown claims and damages that develop in the future. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. , 20 S.W.3d 692, 698 (Tex. 2000) ("Although releases often consider claims existing at the time of execution, a valid release may encompass unknown claims and damages that develop in the future."). Here, the Debtors released Defendants
from all ... claims ... of every name and nature, known or unknown, suspected or unsuspected, which [the Debtors] ... may now or hereafter own, hold, have or claim to have against the [Defendants] ... by reason of any circumstance [or] action, ... including, without limitation, ... in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.
See August 1 Forbearance Agreement at ¶ 14; August 14 Forbearance Agreement at ¶ 12. This language is broad enough to cover any unknown claims and injuries caused by RWHI that were not yet known.
Plaintiff attempts to support its argument with an unreported Texas appellate *665 decision relating to a claim to recover illegal or invalid fees or taxes. See Texas Valla Real Estate I, Inc. v. City of Houston , No. 14-10-00496-CV, 2011 WL 4449652 (Tex. App. Sept. 27, 2011). In that case, the City of Houston refused to release a utility lien on real property after Texas Valla purchased the property at a foreclosure sale. Id. Texas Valla brought several claims, including recovery of payment of a lien paid under duress. Id. at *3. The court determined that Texas Valla's claim was time-barred because it accrued "at the time the payment of the fee or tax [was] made 'because that is when the injury occur[red].' " Id. at *14 (quoting Lowenberg v. City of Dallas , 168 S.W.3d 800, 801 (Tex. 2005) ).
The case, however, is not persuasive on the point for which it is cited. The holding applies narrowly to "a claim to recover illegal or invalid fees or taxes." This limitation is all the more apparent when the case is read in conjunction with the case on which it relies, Lowenberg v. City of Dallas , 168 S.W.3d 800. In Lowenberg , the Texas Supreme Court began its decision as follows: "The question presented is when a claim accrues for refund of an illegal fee . The court of appeals held it accrues when the fee is enacted rather than when it is paid, distinguishing a recent opinion by this Court to the contrary. We disagree, and thus reverse." Id. (emphasis added). Neither Texas Valla Real Estate I or Lowenberg deals with the time at which a tort claim arises. Texas law is clear that it arises when the wrongful conduct occurs and the injury first results, regardless of whether additional injuries arise from that conduct.
iii. Duress as a Defense to the Prepetition Releases
Finally, Plaintiff argues that the Prepetition Releases are voidable because they were obtained as a result of Defendants' duress upon the Debtors. Defendants contend that there was no duress and the Prepetition Releases are valid.
A release obtained by duress is voidable. Jeanes v. Hamby , 685 S.W.2d 695, 702 (Tex. App. 1985, writ ref'd n.r.e.) (citing Mitchell v. C.C. Sanitation Co. , 430 S.W.2d 933, 936 (Tex. App. 1968, writ ref'd n.r.e.) ; Deer Creek Ltd. v. North Am. Mortgage Co. , 792 S.W.2d 198, 203 (Tex. App. 1990, no writ) ; see also Wright v. Sydow , 173 S.W.3d 534, 543-44 (Tex. App. 2004, pet. denied) ("Generally, when one coerces another to execute a contract by taking undue or unjust advantage of the person's economic necessity or distress, the contract may be invalid or unenforceable. This legal theory is called economic duress."). "The elements of duress are the same for both contract and tort." 49 Tex. Prac., Contract Law § 2.35, Duress, coercion, and undue influence-Elements of duress .
As described in Section E below, Plaintiff has not adequately pled the tort of economic duress under Texas law. But even if the Court assumes for the sake of argument that Plaintiff had done so, and that the Prepetition Releases were a result of such duress, the Court would not be able rule on the enforceability of the Prepetition Releases at this stage of the litigation. To succeed in demonstrating that a release (or any other defense) entitles Defendants to immediate dismissal, Defendants would have to show from the face of the Complaint that there is an "obvious bar to securing relief." ASARCO, LLC v. Union Pacific R. Co. , 765 F.3d 999, 1004 (9th Cir. 2014) (emphasis added).
The allegations in the Complaint show that there is a potential bar to relief but not an obvious one. The Complaint raises substantial factual questions. The Prepetition Releases suggest that Plaintiff's *666 claims might be barred, but that will not be the case if Plaintiff adequately pleads-and ultimately proves-that the Prepetition Releases were obtained by duress. Because the Court is limited on a motion to dismiss to evaluating the pleadings and any documents referenced or incorporated therein, and because the duress issue cannot be determined until there is an adequate factual record, the Court cannot conclude at this time whether the Prepetition Releases bar Plaintiff's claims. The Motion to Dismiss on this basis will be denied.
3. The Postpetition Release
Defendants assert that this entire action is barred by the release (the "DIP Release") contained in section 11.13 of the Debtor in Possession Credit Agreement between the Debtors and RWHI (the "DIP Agreement"), Case Dkt. 6 at 229, as approved by the Final DIP Order, Case Dkt. 87. Plaintiff asserts that the DIP Release could not serve as a bar to the Estates' claims until expiration of the 60-day "Lookback Period" provided for in the Final DIP Order (the "Lookback Provision"), Case Dkt. 87, ¶ kk. The DIP Release provides in relevant part as follows:
Release. [The Debtors] hereby acknowledge and agree that, as of the date hereof: (a) [the Debtors] have no claim except as may be provided under this Agreement or the Stalking Horse Agreement or cause of action against [RWHI] ...; (b) [the Debtors have] no offset rights, counterclaims or defenses of any kind against any of their obligations, indebtedness or liabilities to [RWHI]; and (c) [RWHI] has heretofore properly performed and satisfied in a timely manner all of their obligations to the [the Debtors]. [RWHI] wishes (and [the Debtors] agree) to eliminate any possibility that any past conditions, acts, omissions, events, circumstances or matters would impair or otherwise adversely affect any of the rights, interests, contracts, collateral security or remedies of [RWHI]. Therefore, [the Debtors] on each of its own behalf and on behalf of each of its respective successors and assigns, hereby waives, releases and discharges [RWHI] ... from any and all claims, demands, actions or causes of action on or before the date hereof and arising out of or in any way relating to this Agreement, the Loan Documents and any other documents, instruments, agreements, dealings or other matters connected with this Agreement, including, without limitation, all known and unknown matters, claims, transactions or things occurring on or prior to the date hereof relating to this Agreement. The waivers, releases, and discharges contained in this paragraph shall be effective regardless of any other event that may occur or not occur prior to, or on or after the date hereof.
Case Dkt. 6 at 229. This broad release, if approved by the Court, would seem to preclude the Debtors, their successors, and their assigns from pursuing virtually any action against Defendants.
Accordingly, both the Equity Committee and the Creditors' Committee objected on multiple grounds to the motion to approve the DIP Agreement, Case Dkt. 7. The Equity Committee requested that "any final [DIP] order incorporate additional language to clarify that the Equity Committee and creditors may pursue claims and causes of action in their individual capacity and on behalf of the estate to challenge the validity, perfection or enforceability of Radians' prepetition liens." Case Dkt. 86 at 6. The Equity Committee also requested that "any waiver by the estates should not be effective until the Equity Committee and the Creditors' Committee have [had] sufficient time to investigate and challenge Radians' liens, if necessary." Id. at 10. The *667 Creditors' Committee also objected to the DIP Release contained in section 11.13 of the DIP Agreement. See Case Dkt. 85 at 9-10. The Final DIP Order, of which all parties approved as to form, states that the parties resolved both Committees' objections, and the objections were withdrawn. Case Dkt. 87 at 4.
The Lookback Provision at the end of the Final DIP Order provides for a 60-day lookback period in which the Committees would be permitted to pursue an action against RWHI regarding the amount, validity, or enforceability of the prepetition loan, or to bring any other claim that they have, individually or on behalf of the Estates. The language is tailored to address the Equity Committee's objection:
kk. On or before the date that is sixty (60) days from the date of the entry of this Final Financing Order (the "Lookback Period"), the Official Committee of Unsecured Creditors and the Official Committee of Equity Holders shall have standing individually and on behalf of Debtors' Estates to object to, challenge, or seek to avoid the amount, validity, or enforceability of the Pre-Bankruptcy Secured Debt (or any portion thereof) or any of the liens and security interests created under the Pre-Bankruptcy Secured Debt and to bring any other claim that they have against Radians, individually or on behalf of the Debtors' Estates (separately and collectively, a "Challenge"). If no such action, objection or other Challenge is commenced by either the Official Committee of Unsecured Creditors or the Official Committee of Equity Holders within the Lookback Period, the Pre-Bankruptcy Secured Debt will be deemed and adjudicated finally and indefeasibly as valid and enforceable, the liens and security interests created under the Pre-Bankruptcy Secured Debt in the Collateral securing the Pre-Bankruptcy Secured Debt will be deemed and adjudicated finally and indefeasibly as valid, enforceable and perfected liens and security interests in that Collateral, and any affirmative claim(s) or cause(s) of action of any kind against Radians with respect to the Pre-Bankruptcy Secured Debt, or otherwise, and the liens and security interests securing the Pre-Bankruptcy Secured Debt, or any payment received by Radians will be forever barred.
Id. at 19 (emphasis added). The DIP Release also bars the Debtors' right to pursue an action against RWHI regarding the amount, validity, or enforceability of the prepetition loan:
As provided in this Final Financing Order, the Debtors have waived and released, and shall be forever barred from asserting, any right to object to, challenge or seek to avoid, the amount, validity, or enforceability of the Pre-Bankruptcy Secured Debt or the liens and security interests in the Collateral securing the Pre-Bankruptcy Secured Debt.
Id. Defendants now argue that the DIP Release bars this entire action, notwithstanding the Lookback Provision in the Final DIP Order.
Defendants are wrong. First, the provisions of the Final DIP Order take precedence over the DIP Agreement, which contains the DIP Release. See Final DIP Order at 8 ("In the event of a conflict between the Loan Documents and this Final Financing Order, this Final Financing Order shall control."). Second, the Final DIP Order makes clear that, although the Debtors were waiving their rights against RWHI, the ability to bring a claim against RWHI on behalf of the Estates was preserved for a period of 60 days from the date of entry of the Final DIP Order. Id. In other words, the DIP Release is subject *668 to the Lookback Provision. This is what the Court understood and intended when it approved the Final DIP Order, as revised to address and resolve the objections of the Committee.[28] The Final DIP Order was entered on October 6, 2017, and the Equity Committee timely filed the Complaint 60 days later, on December 5, 2017.
Moreover, Courts routinely approve provisions like the Lookback Provision where the claims released by a debtor are preserved for another entity to pursue on behalf of the debtor's estate. See In re Adelphia Commc'ns Corp. , 330 B.R. 364, 383-84 (Bankr. S.D.N.Y. 2005) ("It was necessary (and typical) for the Debtors to accede to such a provision, and for the Court to approve it. Provisions of that character are common in DIP financing orders in chapter 11 cases (at least where prepetition lenders are asked to make concessions to permit the postpetition financing), but bankruptcy courts normally approve them only where some entity-typically a creditors' committee-has the ability to assert those claims.").[29]
Accordingly, the Court rejects the argument that the DIP Release bars this action. The Motion to Dismiss based on the Postpetition Release will be denied.
E. First Cause of Action: Duress
Duress can arise as a defense to a contract claim, see e.g. , Wright v. Sydow , 173 S.W.3d at 543-44, or a tort. See Likover v. Sunflower Terrace II, Ltd. , 696 S.W.2d 468, 472 (Tex. App. 1985) (citing Housing Authority of City of Dallas v. Hubbell , 325 S.W.2d 880, 902 (Tex. App. 1959, writ ref'd n.r.e.) ). Duress of property is also referred to as "economic duress." See id. Under Texas law, economic duress consists of the following elements: (1) the defendant threatened to do some act that it had no legal right to do; (2) the threat was of such a nature as to destroy the free agency of the threatened party; (3) the threat overcame the threatened party's free will and caused it to do what it otherwise would not have done and was not legally bound to do; (4) the restraint *669 caused by such threat was imminent; and (5) the threatened party had no present means of protection. In re Frank Motor Co. , 361 S.W.3d 628, 632 (Tex. 2012) (citing Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp. , 994 S.W.2d 830, 837 (Tex. App. 1999, no pet.) ); see also Dale v. Simon , 267 S.W. 467, 470 (Tex. Comm'n App. 1924, judgment adopted).
Duress "may be evidenced by forcing a victim to choose between distasteful and costly situations, i.e., bow to duress or face bankruptcy, loss of credit rating, or loss of profits from a venture." Trinh v. Lang Van Bui , No. 14-11-00442-CV, 2012 WL 5378112, at *7 n.7 (Tex. App. Nov. 1, 2012) (quoting State Nat. Bank of El Paso v. Farah Mfg. Co. , 678 S.W.2d 661, 686 (Tex. App. 1984, writ granted (Mar. 6, 1985), judgment set aside and cause dismissed (Mar. 6, 1985) ). "Duress must be shown from the acts or conduct of the party accused of duress, not the emotions of the purported victim." McCord v. Goode , 308 S.W.3d 409, 413 (Tex. App. 2010, no pet.). Generally, what constitutes duress is a question of law, but whether duress exists under a particular set of circumstances is a fact question. Wright v. Sydow , 173 S.W.3d at 544. A plaintiff that prevails on a duress claim is entitled to actual pecuniary damages proximately caused by the defendant. See, e.g. , Housing Authority of City of Dallas v. Hubbell , 325 S.W.2d at 905-909.
The gravamen of the Complaint is that Defendants improperly used the acceleration and cash sweeping provisions of the Loan Agreement to further Defendants' own economic interests because Defendants were interested only in acquiring the Debtors' assets. See Complaint, ¶¶ 30-34. The Complaint alleges that Defendants' actions "forced" the Debtors into bankruptcy, which led to a sale of the Debtors' assets for a price that was less than the value of the assets before the sequence of events was set into motion by the acceleration.
Defendants argue that Plaintiff has not stated a claim for duress because: (1) the Complaint does not allege that RWHI threatened to perform an act it had no legal right to perform and instead simply exercised its rights under the Loan Agreement; (2) RWHI was not responsible for the Debtors' underlying financial distress because that distress was caused by the Debtors and their former officers; and (3) the commencement of a bankruptcy case and the administration of that case-which the Debtors took advantage of-is a statutory protection from the sort of duress alleged by Plaintiff, not a form of damage.
1. No Threat Alleged To Act Without A Legal Right To Do So
Defendants argue that the Complaint is inadequate because it fails to allege that (a) RWHI made a threat against the Debtors, (b) to do something that RWHI did not have a legal right to do. Reply at 13. The Court agrees that these and other elements of the cause of action have not been adequately pled. For the reasons set forth below, however, the Court will permit Plaintiff to replead this cause of action.
The Complaint alleges that (i) RWHI's counsel sent a letter to the Debtors declaring a default, accelerating the loan and demanding immediate payment of the entire balance loan balance the day after acquiring the loan, even though RWHI knew the Debtors would be unable to pay the loan, Complaint, ¶ 22, (ii) RWHI thereafter entered into two one-week forbearance agreements while simultaneously making offers to purchase the Debtors' assets, id. , ¶ 23, and (iii) RWHI thereafter began sweeping the Debtors' bank accounts with the intention of "forcing ICPW to shut down [sic], and turn over its assets *670 to Radians." Id. , ¶ 24. Plaintiff alleges that the acceleration of the debt, the brevity of the forbearances, and the subsequent cash sweep "were strictly for Radians' own commercial advantage" and "unjust, oppressive and in bad faith." Id. , ¶ 25.
Although the Complaint describes a series of actions undertaken by RWHI purportedly in the exercise of its rights under the Loan Agreement, and ascribes a bad faith intent to those actions, the Complaint does not specifically identify a threat by RWHI to do anything . Black's Law Dictionary defines "threat" in relevant part as "a declaration, express or implied, of an intent to inflict loss or pain on another." Black's Law Dictionary (10th ed. 2014). The Complaint describes the transmittal of a letter by RWHI one day after its acquisition of the loan, declaring a default and accelerating the loan balance. The Complaint also describes the subsequent exercise of RWHI's cash sweep remedy under the Loan Agreement. None of these actions is alleged to have contained or constituted a threat by RWHI to exercise a remedy or take some other action. Each of these actions was itself the exercise of a remedy of the Loan Agreement. See, e.g. , Nance v. Resolution Trust Corp. , 803 S.W.2d 323, 333 (Tex. App. 1990), writ denied per curiam , 813 S.W.2d 154 (Tex. 1991) ("There is no evidence that Nance's will was overcome by any threat made by Alamo. Indeed, there is no evidence of any threat at all, and the only action of which Nance complains ... was specifically authorized by the terms of the contract.").
Even if a threat were alleged, the Complaint fails to identify the action that was threatened or demonstrate that RWHI did not have a legal right to undertake the threatened action. There are no allegations that the Debtors were not in default or that the Loan Agreement did not provide the remedies exercised by RWHI. Instead, Plaintiff argues that the acceleration and cash sweep were not proper because they were not undertaken in good faith. To support this argument, Plaintiff relies on the Ninth Circuit's decision in Brown v. AVEMCO Investment Corp. , 603 F.2d 1367 (9th Cir. 1979) (construing Texas law), which applied the predecessor to Texas Business and Commercial Code section 1.309. Section 1.309 provides in relevant part:
A term providing that one party or that party's successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or when the party "deems itself insecure," or words of similar import, means that the party has power to do so only if that party in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against which the power has been exercised.
Tex. Bus. & Com. Code § 1.309 (2017); see also Tex. Bus. & Comm. Code § 1.208 (West 1984) (repealed 2003).[30] In Brown, *671 the Ninth Circuit held that when a security agreement permits a lender to accelerate a loan if the borrower leases the collateral to a third party, and the lender accelerates for that reason, the propriety of the acceleration nevertheless depends on the good faith of the lender, as articulated in the statute. Brown , 603 F.2d at 1368-1380 (reversing jury verdict based on instructions that did not incorporate the predecessor to § 1.309 and related equitable principles).
Defendants also rely on State Nat. Bank of El Paso v. Farah Mfg. Co. , 678 S.W.2d 661, 683-88 (Tex. App. 1984, writ granted (Mar. 6, 1985), judgment set aside and cause dismissed (Mar. 6, 1985) ) ("Farah ").[31] In Farah , the Texas Court of Appeals upheld a jury verdict finding, inter alia, a lender liable for duress because it threatened to declare a default and accelerate the debt if the borrower reappointed a prior chief executive officer of the borrower to that position. The court observed that even though the lender had a contractual right to declare a default and accelerate under a change in control provision in the loan documents, the lender was entitled to do so only if the lender had a good faith belief that its security was about to be impaired. See Id. at 684-85 (citing Brown and former Tex. Bus. & Com. Code § 1.208 ). The lender was not entitled to use its acceleration right offensively and for its own commercial advantage.
These cases, however, do not remedy Plaintiff's duress claim. Even if the Court assumes for the sake of argument that RWHI's default declaration and debt acceleration were undertaken in bad faith, the Complaint does not allege that RWHI ever threatened to exercise these remedies. RWHI just exercised them. The present circumstances are materially different than those presented in Farah , where the lender threatened to declare a default and accelerate the note if the borrower did not accede to the lender's demands. And they are even farther afield of Brown , in which the Ninth Circuit held that the acceleration clause at issue was subject to the good faith requirement under the Texas Uniform Commercial Code but was not asked to address the requirements of a claim for duress under Texas law.
Notwithstanding the foregoing analysis, the Court is not persuaded that repleading the duress claim is futile and will grant Plaintiff leave to do so. Based on the facts alleged in the Complaint, it is at least plausible that RWHI's letter declaring a default and accelerating the debt under the Loan Agreement was an implicit threat by RWHI to exercise other remedies or take other actions against the Debtors. Plaintiff may be able to state a claim for duress under Texas law, if Plaintiff can allege that (1) the letter constituted a threat by RWHI to take action that it did not have a legal right to take; (2) the threat was of such a nature as to destroy the free agency of the Debtors; (3) the threat overcame the threatened party's *672 free will and caused it to do what it otherwise would not have done and was not legally bound to do; (4) the restraint caused by such threat was imminent; and (5) the threatened party had no present means of protection.
To be clear, the Court is not prejudging these issues. The Court does not know if facts and law exist to substantiate such allegations. For instance, if RWHI made an implicit threat to exercise remedies other than acceleration under the Loan Agreement, it is not clear whether the exercise of such a remedy is subject to the same good faith requirement as acceleration. If Plaintiff determines to file an amended Complaint alleging the "threat" for purposes of the duress analysis was a threat to exercise the cash sweep or any other remedy, Plaintiff should be prepared to demonstrate why RWHI did not have a legal right to exercise that remedy under section 1.309 and/or otherwise applicable Texas law.
Further, Plaintiff will need to allege facts that specifically address and satisfy all of the elements of a claim for duress under Texas law. The Complaint largely elides over those elements. For instance, the Complaint describes facts suggesting that RWHI acted in bad faith and for motives unrelated to enforcing the Loan Agreement as a creditor. The Complaint further alleges that the Debtors were harmed by RWHI's conduct. But the Complaint does not adequately allege that RWHI "destroy[ed] the free agency "of the Debtors, or "overcame the [Debtors'] free will and caused [them] to do what [they] otherwise would not have done and was not legally bound to do."
The closest Plaintiff comes is to allege that RWHI's conduct "forced" the Debtors to file bankruptcy. But the term "forced" does not necessarily mean to destroy the free agency or overcome the free will of another party-a very specific standard articulated in the Texas case law. The term "forced" may mean merely "done or produced with effort, exertion, or pressure." Merriam Webster's Collegiate Dictionary (10th ed. 1996) at 455. It is not clear from the allegations in the Complaint that RWHI destroyed the Debtors' free agency and overcame their free will-rather than simply adding to the existing pressures facing the Debtors and/or hastening the filing of their bankruptcy cases. If Plaintiff intends to replead the duress cause of action, Plaintiff should consider and address the applicable standard under Texas law and plead facts sufficient to satisfy that standard, if they exist.
2. Responsibility for Financial Distress
Defendants argue that Plaintiff cannot state a claim for duress because Defendants were not responsible for the Debtors' underlying financial distress.[32] They argue that the Debtors' financial distress was a result of the Debtors' and their former officers' conduct, which they allegedly concealed by inflating revenue figures, see Complaint, ¶¶ 16, 19. Defendants argue further that the existence of a different adversary proceeding establishes *673 that Defendants could not have caused the Debtors' financial distress or the bankruptcy filing. See Reply at 21 n.12.
Some Texas courts have held that a party cannot be liable for a duress claim unless the party "was responsible for [the] claimant's financial distress." See First Texas Sav. Ass'n of Dallas v. Dicker Ctr., Inc. , 631 S.W.2d 179, 185-86 (Tex. App. 1982, no writ) ; Simpson v. MBank Dallas, N.A. , 724 S.W.2d 102, 109 (Tex. App. 1987, writ ref'd n.r.e.) (relying on First Texas Sav. Ass'n of Dallas v. Dicker Ctr., Inc. , 631 S.W.2d at 185-86 ); Deer Creek Ltd. v. North Am. Mortgage Co. , 792 S.W.2d 198, 203 (Tex. App. 1990, no writ) (relying on Simpson v. MBank Dallas, N.A. , 724 S.W.2d at 109 ). Other courts have narrowed the principle to apply only when a party alleges that its preexisting financial condition was the reason it submitted to duress. See State Nat. Bank of El Paso v. Farah Mfg. Co. , 678 S.W.2d at 687 ("The First Texas case [631 S.W.2d at 185 ] and those like it are clearly distinguishable. FMC's claim of duress does not rest upon its pre-existing financial condition as the basis for Farah and other board members having submitted to the lenders' threats. It rests primarily upon the acts and conduct of the lenders and the ramifications carried by their threats. Since FMC's pre-existing financial condition is not relevant to its cause of action for duress, [the lenders' contention] is without merit."). Still other courts have simply declined to treat this as a required element of duress. See Sudan v. Sudan , 145 S.W.3d 280, 286 n. 9 (Tex. App. 2004), rev'd on other grounds , 199 S.W.3d 291 (Tex. 2006). The Sudan court could "find no Texas Supreme Court opinion recognizing [responsibility for a duress claimant's financial distress] as a separate element [of duress]." Id. After quoting the portion of First Texas from which this rule was derived, the Sudan court concluded that "because the Texas Supreme Court has never adopted any such requirement, and because we do not agree that it even follows from the quoted sentence of [17] C.J.S. [Contracts, § 177 (1963) ], we decline to treat it as a required element of the defense of duress." Id.
The Motion to Dismiss cannot be granted on this basis under any of the standards by which Texas courts assess financial distress in the context of duress. Under the Farah application of the rule, Defendants need only be responsible for the Debtors' preexisting financial distress if Plaintiff has alleged that the Debtors' preexisting financial condition was the reason they submitted to duress. This is not the case. The Complaint alleges that the Debtors were forced to file for bankruptcy and surrender their assets as a result of RWHI's acceleration of the loan and sweeping of the Debtors' bank accounts. Complaint, ¶¶ 22-28. The Complaint does not rely on the Debtors' preexisting financial condition as a basis for the duress claim; it relies strictly on RWHI's actions that allegedly forced the Debtors into bankruptcy.
But even if financial distress is a required element of duress, as First Texas treated it, the Complaint sufficiently alleges RWHI's responsibility for the Debtors' financial distress. The Complaint alleges that (i) RWHI accelerated the loan and demanded payment of approximately $ 3.7 million even though RWHI knew the Debtors had a cash balance of less than $ 300,000, Complaint, ¶ 22; (ii) the Debtors were negotiating with a number of other prospective lenders, but RWHI refused to allow the Debtors the time to arrange refinancing, id. , ¶ 23; (iii) RWHI began sweeping the Debtors' bank accounts even though RWHI knew the Debtors could not operate without such cash, id. , ¶ 24; and (iv) this forced the Debtors to file for bankruptcy and surrender their assets, id. , *674 ¶¶ 26-28. These allegations, accepted as true, plausibly establish that RWHI's actions resulted in financial distress to the Debtors. The Defendants argue that the Debtors were already under financial distress, and, implicitly, that RWHI's actions did not worsen the Debtors' situation or accelerate its need for bankruptcy protection. But this is a Motion to Dismiss and the Defendants' argument is essentially a factual one. The Defendants' version of the facts cannot be determined on the pleadings.
3. Protection Through the Bankruptcy Court
Defendants argue that Plaintiff cannot state a claim for duress because the Debtors always had the option to seek the protections of bankruptcy:
Throughout the period from July 26, 2017 until September 1, 2017 and beyond, the [the Debtors] had experienced counsel representing the corporations. As is clear from the filing of the Bankruptcy Cases, the [the Debtors] had the ability to seek the protection of the United States Bankruptcy Court at any time
MTD at 19. There are two flaws with Defendants' argument. First, the Debtors' bankruptcy forms the basis of Plaintiff's claim for duress. The Complaint alleges that RWHI improperly used the acceleration and cash sweeping provisions to force the Debtors into bankruptcy, ¶¶ 31-32, and in so doing, prevented the Debtors from obtaining out-of-court financing or otherwise engaging in strategic transactions on terms more favorable than those achieved in bankruptcy, id. , ¶ 33. See id. , ¶ 28. Thus, even if Debtors' bankruptcy filing provided the Debtors some form of protection, the Complaint alleges that the Debtors nevertheless were harmed by the bankruptcy process. In other words, Plaintiff is alleging that the Debtors were worse off because the Defendants' alleged duress caused the Debtors to go through a bankruptcy process that they otherwise would not have had to go through. Texas law clearly contemplates that compelling an entity to resort to bankruptcy may itself be compensable injury. See State Nat. Bank of El Paso v. Farah Mfg. Co. , 678 S.W.2d at 686 ("Economic duress ... may be evidenced by forcing a victim to choose between distasteful and costly situations, i.e., bow to duress or face bankruptcy, loss of credit rating, or loss of profits from a venture.").
Second, to the extent Defendants are arguing that the Debtors could have and should have sought bankruptcy protection sooner, that issue simply cannot be determined on the pleadings. The Complaint alleges that the parties negotiated from the time RWHI declared a default to the time it began sweeping the Debtors' bank accounts-during which time RWHI continued to make purchase offers to the Debtors. Complaint, ¶¶ 23-24. Without considering the facts and circumstances surrounding the parties' behavior prepetition, it would be impossible to determine whether the Debtors could have sought bankruptcy protection sooner than they did. This argument is simply not supported by the facts pled in the Complaint.
* * *
For the reasons set forth in Section E.1 above, the Court will grant the Motion to Dismiss with respect to the First Cause of Action: Duress, with leave to amend.
F. Second Cause of Action: Breach of Covenant of Good Faith and Fair Dealing
The Complaint alleges that the Loan Agreement "included an implied covenant of good faith and fair dealing" that prohibited each party from acting in a way that *675 would destroy or injure the other party's right to receive the benefits of the contract, Complaint, ¶¶ 36-37, and that RWHI breached that duty by enforcing the acceleration and cash sweep provisions of the Loan Agreement in a manner that was unjust, oppressive, and designed to further RWHI's own economic interests at the expense of the Debtors, id. , ¶ 38. Defendants contend that these allegations do not amount to a standalone cause of action.
Texas common law does not recognize an implied duty of good faith and fair dealing-breach of which constitutes a tort-in every contract or business transaction. Formosa Plastics Corp. v. Presidio Eng'rs & Contrs., 960 S.W.2d 41, 52 (Tex. 1998) ; English v. Fischer , 660 S.W.2d 521, 522 (Tex. 1983). "Texas courts have carved out exceptions for certain 'special relationships' such as between insurers and insured, principal and agent, joint venturers and partners. Cockrell v. Republic Mortg. Ins. Co. , 817 S.W.2d 106, 116 (Tex. App. 1991) (citing Arnold v. Nat'l County Mut. Fire Ins. Co. , 725 S.W.2d 165, 167 (Tex. 1987) and other authority). These "special relationships" do not include the relationship between a lender and a borrower. Cockrell v. Republic Mortg. Inc. Co. , 817 S.W.2d at 116 ; Nance v. Resolution Trust Corp. , 803 S.W.2d at 333 ; Georgetown Assoc. Ltd. v. Home Fed. Sav. And Loan Ass'n, 795 S.W.2d 252, 255 (Tex. App. 1990), writ dismissed w.o.j. ; Victoria Bank & Trust Co. 779 S.W.2d 893, 902 (Tex. App. 1989), rev'd on other grounds 811 S.W.2d 931 (1991).
"Absent an Arnold 'special relationship,' the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort." Adolph Coors Co. v. Rodriguez , 780 S.W.2d 477, 481 (Tex. App. 1989), no writ , (no duty of good faith and fair dealing in supplier-distributor relationship) [hereinafter "Coors " ]; Lumpkin v. H & C Comms., Inc. , 755 S.W.2d 538, 540 (Tex. App. 1988), writ denied , (no duty of good faith and fair dealing in an employer-employee relationship).
The contractual duty of good faith in a commercial setting has been codified at Texas Business and Commerce Code section 1.304. Tex. Bus. & Comm. Code § 1.304 (2017). This statute provides: "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." Id. Applying the nearly identical predecessor to section 1.304,[33] the Texas Court of Appeals explained as follows:
The duty of good faith and fair dealing is aimed at making effective the agreement's promises. It defines other duties which grow out of specific contract terms and obligations. Therefore, in order to be actionable as a breach of contract under [former section 1.304 ], bad faith conduct must relate to some aspect of performance under the terms of the contract.
Coors , 780 S.W.2d at 481 (citations omitted). Further, "The agreement made by the parties and embodied in the contract itself cannot be varied by an implied covenant of good faith and fair dealing." Id. at 482 (citing Exxon Corp. v. Atlantic Richfield Co., 678 S.W.2d 944, 947 (Tex. 1984) ). At most, it gives rise to claim for breach of *676 contract. See Central Sav. And Loan Ass'n v. Stemmons Northwest Bank, N.A. , 848 S.W.2d at 239 (citing Adolph Coors Co. v. Rodriguez , 780 S.W.2d at 481-82 ) ("A breach of this implied duty under the code gives rise only to a cause of action for breach of contract.") ).[34] Thus, the enforcement of a contractual provision in accordance with its terms, but otherwise in bad faith, is not itself a tort.
Here, the Plaintiff alleges that RWHI enforced the acceleration and cash sweep provisions of the Loan Agreement in bad faith, i.e., for the purpose of leveraging the Debtors to sell RWHI its business. Plaintiff argues that this violates the specific duty in section 1.309 of the Texas Business and Commerce Code not to exercise an acceleration clause or certain other enforcement provisions unless the RWHI believed in good faith that the prospect of payment or performance was impaired. Plaintiff also argues that this violates RWHI's more general duty under section 1.304 to act in good faith when performing and enforcing the Loan Agreement. Although not express, the Complaint appears to treat this cause of action as one sounding in tort. But there is no allegation that RWHI and the Debtors had any of the relationships that Texas law recognizes as a "special relationship" giving rise to potential tort liability for breach of the duty of good faith. To the contrary, the Complaint alleges that the contractual relationship between the Debtors and RWHI was that of lender and borrower under the Loan Agreement.
Accordingly, to the extent Plaintiff is alleging a tort for breach of the covenant of good faith and fair dealing under the Loan Agreement, the Motion to Dismiss will be granted with prejudice. Under the circumstances alleged, such a tort does not exist under Texas law and repleading would be futile. However, to the extent Plaintiff is asserting a breach of contract claim based on RWHI's alleged breaches of the implied duty of good faith and fair dealing, the Motion will be granted with leave to amend. If the Plaintiff elects to replead this claim, he should be sure to allege all of the elements of such a claim and allege facts to support those elements. In particular, Plaintiff should pay special attention to the issue of damages and identify those damages it alleges are compensable as a result of the breach of contract.
G. Third Cause of Action: Unjust Enrichment
The Complaint alleges that (a) "wrongful actions include using the acceleration and sweeping provisions of the Loan Agreement to coerce unreasonable terms and *677 other consideration from [the Debtors], including a pre-payment fee and the Break-Up Fee," Complaint, ¶ 43, (b) "[b]y receiving such payments, [RWHI] was unjustly enriched, and the Debtors' estates were unjustly damaged, id. , ¶ 44, and (c) "[RWHI] should return such payment to the Debtors' estates, id. , ¶ 45. In its Opposition, the Plaintiff says the "third cause of action seeks return of the pre-payment fee and Break-up Fee on unjust enrichment grounds." Opp. at 14.
The asset purchase agreement among RWHI and the Debtors (the "APA") provided that RWHI would receive a breakup fee of $ 500,000 (the "Breakup Fee") if RWHI was not the winning bidder in an auction for the Debtors' assets or if the Debtors proceeded with a plan of reorganization. See Greulich Decl. at 271-72. On September 28, 2017, the Court entered an order approving the form of the APA and the bidding procedures (the "Bidding Procedures Order"). Case Dkt. 71. On November 3, 2017, the Court entered an order approving the sale of substantially all the Debtors' assets (the "Sale Order"). Case Dkt. 177. The Court made the following findings in the Bidding Procedures Order:
D. The $ 500,000 break-up fee proposed to be paid to [RWHI] in the event of a successful overbid (the "Breakup Fee") is reasonable and appropriate under the circumstances of these cases, is in the best interests of these bankruptcy estates, and, under the circumstances of these cases, is the best option currently available to the Debtors to enable the Debtors to (i) attract and retain the [RWHI] bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. [RWHI] was not willing to serve as the stalking horse bidder without the payment of the $ 500,000 Breakup Fee.
...
H. There is no other buyer who is in a position at this time to sign a binding sale agreement at [RWHI's] proposed purchase price, agree to a lower break-up fee than [RWHI] is requiring, and provide the Debtors the necessary post-bankruptcy financing to enable the Debtors to operate their business in the ordinary course pending the Auction.
Case Dkt. 71, ¶¶ D, H. In the Sale Order, the Court explicitly ordered the escrow agent for the sale of the Debtors' assets to pay RWHI the Breakup Fee. See Case Dkt. 177, ¶ 11.
The prepayment fee referred to in the Complaint was a result of the August 1 Forbearance Agreement negotiated by the parties prepetition. The August 1 Forbearance Agreement modified the Loan Agreement to provide RWHI with a prepayment fee of $ 120,000 if the loan was repaid in conjunction with financing or an asset sale to a party other than RWHI (the "Prepayment Fee"). See August 1 Forbearance Agreement at 3-4, § 7. Unlike the Breakup Fee, the Prepayment Fee was never expressly approved by the Court.
Plaintiff's argument that the Estates should recover the Breakup Fee is an impermissible collateral attack on a final order of a federal court. The Bidding Procedures Order and the Sale Order became final orders no later than November 3, 2017, when the Sale Order was entered. See Bullard v. Blue Hills Bank , --- U.S. ----, 135 S.Ct. 1686, 1692, 191 L.Ed.2d 621 (2015) ("Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case."); Bonham v. Compton (In re Bonham) , 229 F.3d 750, 761 (9th Cir. 2000) (bankruptcy court order is final and appealable where it resolves and seriously affects substantive rights and finally determines the discrete *678 issue to which it is addressed). The deadline to appeal the Bidding Procedures Order and the Sale Order was no later than November 17, 2017, 14 days after the Sale Order was entered. See Fed. R. Bankr. P. 8002(a) ; 28 U.S.C. § 158(c)(2). There was no appeal of either order, and their finality is therefore not subject to challenge. A final order of a federal court may not be collaterally attacked. Alakozai v. Citizens Equity First Credit Union (In re Alakozai) , 499 B.R. 698, 704 (9th Cir. BAP 2013 (citing Watts v. Pinckney , 752 F.2d 406, 410 (9th Cir. 1985), Heritage Pac. Fin. LLC v. Machuca (In re Machuca) , 483 B.R. 726, 733 (9th Cir. BAP 2012), and Woods & Erickson, LLP v. Leonard (In re AVI, Inc.) , 389 B.R. 721, 731 (9th Cir. BAP 2008) ). Therefore, Plaintiff cannot now challenge-under the guise of an unjust enrichment claim-the Bidding Procedures Order, the Sale Order, or the findings made in those orders in order to recover the Breakup Fee.
As to both the Prepayment Fee and the Breakup Fee, the unjust enrichment claim also fails because the parties' dispute was covered by a valid, express contract. Unjust enrichment is "an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." Villarreal v. Grant Geophysical, Inc. , 136 S.W.3d 265, 270 (Tex. App. 2004, pet. denied). "A party may recover under a theory of unjust enrichment when one party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." First Union Nat'l Bank v. Richmont Capital Partners I, L.P. , 168 S.W.3d 917, 931 (Tex. App. 2005), aff'd , 168 S.W.3d 917 (Tex. 2005). But the doctrine of unjust enrichment "applies the principles of restitution to disputes which are not governed by a contract between the contending parties." Id. The policy is rooted in contract theory:
Unjust enrichment claims are based on quasi-contract and are predicated on the absence of an express contract controlling the circumstances. Generally, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory because parties should be bound by their express agreements.
Id. (internal citations omitted).
Plaintiff argues that he has a claim for unjust enrichment because RWHI obtained certain benefits from the Debtors by duress, namely the Prepayment Fee and the Breakup Fee. Opp. at 14. At oral argument, Plaintiff contended that there was no valid, express contract controlling the circumstances here because the Complaint alleges that the Forbearance Agreements were obtained by duress. But this argument suffers a fatal flaw. Even if Plaintiff can prove that the Forbearance Agreements are voidable because they were procured by duress, this does nothing to void the original Loan Agreement-the valid, express agreement that governed the debtor-creditor relationship between RWHI and the Debtors. Nor would it do anything to void the Court-approved APA, which governed their relationship as potential buyer and seller of the Debtors' assets in the bankruptcy case. "[T]here can be no recovery under a quasi-contract theory because the parties should be bound by their express agreements." First Union Nat'l Bank v. Richmont Capital Partners I, L.P. , 168 S.W.3d at 931.
For these reasons, the Third Cause of Action: Unjust Enrichment fails to state a claim upon which relief can be granted. The Court will grant the Motion to Dismiss with respect to this claim with prejudice because the Court finds that additional *679 pleading of this claim would be futile.[35]
H. Fourth Cause of Action: Recovery of an Unauthorized Postpetition Transfer
The Fourth Cause of Action for Avoidance and Recovery of Property Transfer seeks to avoid and recover, under Bankruptcy Code sections 549 and 550, "the transfer of property in the form of the payment based on Radians' Claim." Complaint, ¶¶ 29, 46-49. Although the "Claim" is defined in the Complaint to mean RWHI's prepetition debt claim under the Loan Agreement, see Complaint, ¶ 7, the Court understands the Plaintiff to mean all amounts paid to RWHI in the case, including the Break-Up Fee, which first arose when the Court approved the APA between RWHI and the Debtors. Bankruptcy Code section 549 provides for the avoidance of unauthorized postpetition transfers by a debtor in possession.
Under 11 U.S.C. § 549, a trustee may "avoid a transfer of property of the estate - - (1) that occurs after the commencement of the case; and ... (2) ... (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a)(1), (2)(B) (West 2004). "If a trustee seeks to recover a postpetition transfer under section 549, ... the trustee must show that a transfer occurred after the filing of the bankruptcy petition and that the transfer was not authorized by either the bankruptcy court or the [Bankruptcy] Code." Mora v. Vasquez (In re Mora) , 199 F.3d 1024, 1026 (9th Cir. 1999) (citations omitted).
Aalfs v. Wirum (In re Straightline Invs.), 525 F.3d 870, 877 (9th Cir. 2008). Section 550 permits the recovery of transfers avoided under section 549. See 11 U.S.C. § 550. The problem is that the Complaint does not identify any unauthorized transfers that are avoidable. Payment of the original prepetition debt obligation, the Prepayment Fee and the Break-Up Fee were all authorized by the Court pursuant to the Sale Order.
Accordingly, the Fourth Cause of Action: Recovery of an Unauthorized Postpetition Transfer will be dismissed with prejudice. Repleading would be futile because the payment of these amounts was expressly authorized by an order of the Court.
I. The Claim Objection
The Complaint objects to the Claim filed in the Debtors' cases by RWHI for amounts owed under the Loan Agreement (the "Claim Objection"). See Complaint, ¶¶ 7, 29. The Complaint states that the claim is objectionable under Bankruptcy Code section 502"[b]ased on the above-described misconduct and inequitable actions on the part of the Radians entities...." Id. , ¶ 29. But the Complaint fails to address any basis for objection under Bankruptcy Code section 502(b). This section provides that if an objection to a claim is made, after notice and a hearing, the court shall allow such claim, except to the *680 extent any of a list of circumstances are present. The most common circumstance asserted is under section 502(b)(1), that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The Complaint fails to show that this or any other basis for objection under section 502(b) has been satisfied. What the Plaintiff effectively argues is that RWHI's conduct leading up to the bankruptcy somehow invalidates the Debtors' obligation to repay the prepetition debt outstanding under the Loan Agreement-not including the Prepayment Fee and the Break-Up Fee. But the Plaintiff has provided no legal basis on which to reach such a conclusion.
Accordingly, the Court will grant the Motion to Dismiss the Claim Objection. However, the Court will grant leave to the Plaintiff to replead. Although the Court is skeptical that there is a legal basis to invalidate the entirety of the prepetition debt, the Court acknowledges that this issue was not the focus of the briefing or the argument on the Motion to Dismiss. If the Plaintiff repleads its claim objection, it should be sure to identify and explain both the factual and legal basis for disallowing the Claim.
VI. CONCLUSION
Based on the foregoing, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART as follows:
• As to all claims against Safety Supply and Radians: GRANTED WITH LEAVE TO AMEND.
• As to all claims based on the Prepetition Releases: DENIED.
• As to all claims based on the Postpetition Release: DENIED.
• As to the First Cause of Action - GRANTED WITH LEAVE TO AMEND.
• As to the Second Cause of Action - GRANTED WITH LEAVE TO AMEND, TO THE EXTENT PLAINTIFF ASSERTS A CLAIM FOR BREACH OF CONTRACT.
• As to the Third Cause of Action - GRANTED WITH PREJUDICE.
• As to the Fourth Cause of Action - GRANTED WITH PREJUDICE
• As to the Claim Objection: GRANTED WITH LEAVE TO AMEND.

At the time of filing, the Debtors' corporate name was "Ironclad Performance Wear Corporation," which the Court subsequently authorized the Debtors to change to "ICPW Liquidation Corporation." See Case Dkt. 218.

Unless otherwise noted, all references to "Adv. Dkt." refer to entries on the docket of the instant proceeding, Adversary Proceeding No. 1:17-ap-01101-MB, Official Committee of Equity Holders of ICPW Liquidation Corporation v. Radians Wareham Holding, Inc. et al. , and all references to "Case Dkt." refer to entries on the docket of Bankruptcy Case No. 1:17-bk-12408-MB, In re ICPW Liquidation Corporation, a California Corporation .

The Greulich Declaration was resubmitted for purposes of this adversary proceeding as an Exhibit to the Declaration of E. Franklin Childress, Jr. in Support of Defendants' Motion to Dismiss ("Childress Decl."), Adv. Dkt. 6 & 6-1.

Each appears on the record in at least three places: (1) the Childress Decl., Adv. Dkt. 6 & 6-1; (2) the Greulich Decl., Case Dkt. 6; and (3) the RWHI Proof of Claim.

(as later amended and modified, the "Loan Agreement"), Childress Decl., Adv. Dkt. 6 at 24; Greulich Decl., Case Dkt. 6 at 18; POC at 7.

Childress Decl. at 74; Greulich Decl. at 68; POC at 56.

Childress Decl. at 84; Greulich Decl. at 78; POC at 78.

Childress Decl. at 89; Greulich Decl. at 83; POC at 83.

Childress Decl. at 94; Greulich Decl. at 88; POC at 88.

Childress Decl. at 102; Greulich Decl. at 96; POC at 96.

Childress Decl. at 107; Greulich Decl. at 101; POC at 101.

Childress Decl. at 127; Greulich Decl. at 121; POC at 112.

Childress Decl. at 134; Greulich Decl. at 128; POC at 118.

This document is hereinafter referred to as the "August 1 Forbearance Agreement." See Childress Decl. at 142; Greulich Decl. at 136; POC at 125.

This document is hereinafter referred to as the "August 14 Forbearance Agreement" and together with the August 1 Forbearance Agreement, the "Forbearance Agreements"). See Childress Decl. at 153; Greulich Decl. at 147; POC at 147. There is confusion among the parties as to whether RWHI and the Debtors executed a third forbearance agreement. The Complaint alleges that "[t]wo one-week forbearances-one signed August 1st, the other signed August 14th-were all that [RWHI] was willing to accept," Complaint ¶ 23, but the Opposition states "the last of the relevant releases was executed on August 25, 2017." Opp. at 25. The Motion to Dismiss discusses a forbearance agreement dated August 30, 2017. Attached to the Childress Decl. at 164 and the Greulich Decl. at 158 is a "Second Forbearance Agreement" dated August 25, 2017 but attached to the POC at 159 is a "Second Forbearance Agreement" dated August 30, 2017. The existence or effective date of a third forbearance agreement has no dispositive effect on the Court's ruling on the Motion to Dismiss.

Although Defendants raise this argument in the context of the claim for duress, the Complaint alleges all claims against all three Defendants, and the pleading deficiencies identified by Defendants apply to the entire Complaint.

Plaintiff cites "Tex. Civ. Prac. & Rem. Code Ann. § 33.0139(a)-(b)" as the authority for assigning proportionate liability. Since there is no such section of the Texas Civil Practice and Remedies Code, the Court has considered the entire Chapter 33 of Title 2 of that Code.

"Civil conspiracy" came to be used to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." Carroll v. Timmers Chevrolet, Inc. , 592 S.W.2d 922, 925 (Tex.1979) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 46, at 293 (1971) ).

See also Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges: Civil Conspiracy , PJC 109.1 (2014) ("One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy."); 15A C.J.S. Conspiracy § 6, Overt Act ("civil conspiracy requires at least one overt act, committed by at least one conspirator, in furtherance of the conspiracy").

Typically, a notation of "writ refused" indicates that the Texas Supreme Court has adopted the opinion as its own. See Tex. R. App. P. 56.1(c) ("If the Supreme Court determines-after a response has been filed or requested-that the court of appeals' judgment is correct and that the legal principles announced in the opinion are likewise correct, the Court will refuse the petition with the notation 'Refused.' The court of appeals' opinion in the case has the same precedential value as an opinion of the Supreme Court."). However, the "n.r.e." notation indicates the Supreme Court's dissatisfaction with some aspect of the appellate court's declaration of the law but not the result. See Tex. R. App. P. 483 (repealed Sept. 1, 1986) ("In all cases where the Supreme Court is not satisfied that the opinion of the Court of Civil Appeals in all respects has correctly declared the law, but is of the opinion that the application presents no error which requires reversal, the Court will deny the application with the notation 'Refused. No Reversible Error.' "). Former Texas Supreme Court Justice Ted Z. Robertson and Professor James W. Paulsen concluded that the "writ ref'd n.r.e." notation was "in every sense a decision on the merits of the appeal." Hon. Ted Z. Robertson & James W. Paulsen, Rethinking the Texas Writ of Error System , 17 Tex. Tech L. Rev. 1, 26 (1986).

In his Opposition, Plaintiff alleges for the first time that the Prepetition Releases should be avoided as fraudulent transfers pursuant to Bankruptcy Code section 548. Opp. at 19. The Complaint does not allege fraudulent transfers or make any reference to avoidance of a prepetition transfer under the Bankruptcy Code. Therefore, the Complaint does not "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Accordingly, the fraudulent transfer theory cannot be used to overcome Defendants' Motion to Dismiss.

Similarly, the Bankruptcy Code renders unenforceable restrictions on a debtor's assignment of property interests or conditions that would result in forfeiture of a debtor's prepetition rights. See 11 U.S.C. § 541(c)(1) ("an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law ... (A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on the ... financial condition of the debtor ... and that effects ... a forfeiture ... of the debtor's interest in property.").

See Opposition citing In re Jeff Benfield Nursery, Inc. , 565 B.R. 603, 608-09 (Bankr. W.D. N.C. 2017) (prepetition waiver of protection of the automatic stay under 11 U.S.C. § 362 was per se unenforceable); In re Intervention Energy Holdings , 553 B.R. 258, 263 (Bankr. D. Del. 2016) (creditor holding one common unit in debtor limited liability company that issued a total of 22,000,001 common units could not enforce its blocking right because "prepetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable"); In re South East Financial Assocs., Inc. , 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (where debtor entered into prepetition stipulation providing that any breach of the stipulation would constitute "bad faith" as to warrant dismissal under 11 U.S.C. § 1112(b), the provision was not enforceable against unsecured creditors who were not bound by the stipulation and would be detrimentally impacted by dismissal); In re Atrium High Point Ltd. Partnership , 189 B.R. 599, 607-08 (Bankr. M.D.N.C. 1995) (prepetition waiver of protection of the automatic stay under 11 U.S.C. § 362 could not bind third parties who were not parties to the agreement); In re Tru Block Concrete Prods., Inc. , 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983) (debtor's prepetition agreement to waive protections of bankruptcy was "wholly void as against public policy").

This is contrary to Plaintiff's representation in his Opposition that the American Sweeteners court held that a "mutual release binds [the] debtor, but not objecting third parties or non-parties." See Opp. at 16.

Under Texas law, a statute of limitations may be tolled when the plaintiff is under continuing duress that prevents it from timely asserting its claim. See Pierce v. Haverlah's Estate , 428 S.W.2d 422, 426 (Tex. App. 1968, writ ref'd n.r.e.). But even then, "the action [still] accrues when the wrongful act occurs..." Whatley v. Nat'l Bank of Commerce , 555 S.W.2d 500, 506 (Tex. App. 1977, no writ) (emphasis added).

There is an inherent contradiction with Defendants' interpretation of the DIP Release and the Lookback Provision. If, as Defendants contend, the DIP Release was intended to immediately and unconditionally release both the Debtors' and the Estates' claims and causes of action against RWHI, and the Lookback Provision further released both the Debtors' and the Estates' ability to challenge the amount, validity, or enforceability of the prepetition loan, then there would be nothing remaining to assign to the Committees. In other words, the Court would be granting the Committees standing on behalf of the Estates to pursue certain actions against RWHI, while simultaneously ruling that any such action is barred by the DIP Release.

The Adelphia court went on to say, "If the Court were then to deprive the Creditors' Committee of standing, that would undercut one of the critical premises upon which those limitations were approved in these chapter 11 cases. It would deprive the estates of the opportunity to pursue claims that, whether or not they ultimately will be meritorious, plainly deserve to be pursued."Id. at 384. The court also cited the S.D.N.Y. Gen. Order No. M-274, "Guidelines for Financing Requests," "Extraordinary Provisions," ¶ 3, which provides as follows:
The Court will not consider as extraordinary the debtor's stipulation as to validity, perfection, enforceability, priority and non-avoidability of a prepetition lender's claim and liens, and the lack of any defense thereto, provided that:
(a) the Official Committee of Unsecured Creditors (the "Committee"), appointed under section 1102 of the Bankruptcy Code, has a minimum of 60 days (or such longer period as the Committee may obtain for cause shown before the expiration of such period) from the date of the order approving the appointment of counsel for the Committee to investigate the facts and bring any appropriate proceedings as representative of the estate ....

The Loan Agreement provides that the Texas version of the Uniform Commercial Code governs the security interests thereunder. See Loan Agreement at 16, § 3.2. That statute is contained in title 1 of the Texas Business and Commerce Code. The predecessor to section 1.309 applicable in Brown was section 1.208, which provided as follows:
A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.
Tex. Bus. & Comm. Code section 1.208 (West 1984) (repealed 2003).

After Farah was appealed to the Texas Supreme Court, the judgment was vacated pursuant to the parties' "joint motion to dismiss the entire case as settled." See William E. Hartsfield, 1 Investigating Employee Conduct § 4:41 n.2 "Economic Duress" (2018); Michael T. Madison, Jeffry R. Dwyer, Steven W. Bender, 2 Law of Real Estate Financing § 14:15"Duress" (2017). Although both sides cite to this case, neither side addresses its precedential value, if any, given that the matter was settled, and the judgment vacated. Because the Court's decision does not depend on Farah , it is not necessary to adjudicate this issue. In any future proceedings, however, the parties should be cognizant of the issue and be prepared with legal authority demonstrating the extent of Farah's precedential value, if any.

Although Defendants refer to this as the "causation" element of duress, see MTD at 13, 18-19, causation for purposes of duress asks whether the defendant's actions contributed substantially to the plaintiff doing what it otherwise would not have done and was not legally bound to do. See Sudan v. Sudan , 145 S.W.3d 280, 287 (Tex. App. 2004), rev'd on other grounds , 199 S.W.3d 291 (Tex. 2006) ("The test for causation, i.e., whether the duress contributes substantially to the claimant's decision to assent, is subjective, considering all surrounding circumstances, such as the background and relationship of the parties and the emotional condition of the party claiming duress.") (citing Restatement (Second) of Contracts § 175 cmt. c (Am. Law Inst. 1981) ).

See Tex. Bus. & Comm. Code § 1.203 (West 1984) (repealed 2003) ("Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.") The only textual difference apparent to the Court is the change from "performance or enforcement" in the repealed statute to "performance and enforcement" in the current statute.

See also Tex. Bus. & Comm. Code § 1.304 cmt. n.1. The text of that comment provides in relevant part:
This section sets forth a basic principle running throughout the Uniform Commercial Code. The principle is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. While this duty is explicitly stated in some provisions of the Uniform Commercial Code, the applicability of the duty is broader than merely these situations and applies generally, as stated in this section, to the performance or enforcement of every contract or duty within this Act.... This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power . This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.
Id. (emphasis added)

The Court notes that if the Plaintiff successfully pleads and proves that the Forbearance Agreements are void because they resulted from duress under Texas law, the Court's holding here does not preclude Plaintiff from arguing that by receiving the Prepayment Fee RWHI received more than it was entitled to receive under the Loan Agreement and/or that payment of the Prepayment Fee is compensable as damages arising from the duress. Likewise, if the Plaintiff successfully pleads and proves that the APA resulted from duress, and proves that the Break-Up Fee is a compensable form of damages for that cause of action, the Court's holding here does not preclude such recovery. The Court is merely holding that unjust enrichment is not an independent cause of action when there are contracts governing the relationships of the parties.